EDWARDS, Senior Circuit Judge,
concurring in part and dissenting in part:
Table of Contents
I. Standing
A. The Companies Have No Standing to Pursue a Cause of Action Under RFRA
B. The Owners of the Companies Have Standing in This Case to Pursue a Cause of Action Under RFRA
II. Free Exercise Jurisprudence
A. First Principles: The Limited Reach of the Free Exercise Clause
B. The Evolution of the Substantial Burden/Compelling Governmental Interest Test During the Twenty-seven Years from Sherbert to Smith
C. Congress’ Enactment of RFRA in Reaction to Smith: Restoration of the Substantial Burden/Compelling Governmental Interest Test
III. The Mandate Does Not Substantially Burden Appellants’ Religious Objections to the Use of Contraceptive Products
IV. Compelling Governmental Interests Justify the Mandate
*1226 I agree that Appellants Francis and Phil Gilardi have standing to pursue a cause of action under the Religious Freedom Restoration Act (“RFRA”), 42 U.S.C. §§ 2000bb-2000bb-4. I also agree with Judge Brown that the corporate entities that are solely owned by the Gilardis, Freshway Logistics, Inc. and Fresh Unlimited, Inc., d/b/a Freshway Foods (collectively “Freshway”), do not have standing to seek relief under RFRA.
However, I strongly disagree with the majority’s holding on the merits. Under the Patient Protection and Affordable Care Act of 2010 (“Affordable Care Act”), 42 U.S.C. § 300gg-13(a)(4), Freshway is required to include in its health care plan “[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity.” See Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventative Services Under the Patient Protection and Affordable Care Act, 77 Fed.Reg. 8725, 8725 (Feb. 15, 2012); see id. at 8725 n. 1 (providing hyperlink to the applicable Health Resources and Services Administration guidelines). The Gilardis contend that compliance with this directive — also known as “the Mandate” — will force them to violate “their Catholic religious beliefs” against contraception. Br. of Appellants at 14.
No one doubts the sincerity of the Gilardis’ religious beliefs against contraception. Their legal claim, however, is seriously wanting. The Gilardis complain that the Mandate imposes a “substantial burden” on their “exercise of religion” under RFRA, 42 U.S.C. § 2000bb-l(a), because their companies are required to provide health insurance that includes contraceptive services. This is a specious claim.
It has been well understood since the founding of our nation that legislative restrictions may trump religious exercise. Braunfeld v. Brown, 366 U.S. 599, 603, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). Were it otherwise, “professed doctrines of religious belief [would be] superior to the law of the land, and in effect ... permit every citizen to become a law unto himself. Government could exist only in name under such circumstances.” Reynolds v. United States, 98 U.S. 145, 167, 25 L.Ed. 244 (1878). As the Court noted in Lyng v. Northwest Indian Cemetery Protective Association, 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988):
The First Amendment must apply to all citizens alike, and it can give to none of them a veto over public programs that do not prohibit the free exercise of religion. The Constitution does not, and courts cannot, offer to reconcile the various competing demands on government, many of them rooted in sincere religious belief, that inevitably arise in so diverse a society as ours. That task, to the extent that it is feasible, is for the legislatures and other institutions.
Id. at 452, 108 S.Ct. 1319.
The Gilardis’ claim in this case finds no support in the law. They are not required to use or endorse contraception, and they remain free to openly oppose contraception. The Mandate requires nothing more than that the companies, not the Gilardis, offer medical insurance that includes coverage of contraceptive services for those employees who want it. The Supreme Court has never applied the Free Exercise Clause to find a substantial burden on a plaintiffs religious exercise where the plaintiff is not himself required to take or forgo action that violates his religious beliefs, but is merely required to take action that might enable other people to do things that are at odds with the plaintiffs religious beliefs. Therefore, the Gilardis cannot claim to be substantially burdened by the Affordable Care Act — a neutral *1227 statute of general applicability that regulates public health and welfare and in no way limits their exercise of religion.
If I were to indulge the implausible suggestion that the Mandate imposes a substantial burden on Appellants’ exercise of religion, I would disagree with the majority’s conclusion that the Government has failed to establish that the Mandate is the least restrictive means of furthering a compelling interest. When the record in this case is viewed through the lens of well-established precedent, the Mandate easily satisfies the requirements of the compelling governmental interest test.
As the Supreme Court made clear in United States v. Lee, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982), a decision that has been repeatedly cited and never questioned:
Congress and the courts have been sensitive to the needs flowing from the Free Exercise Clause, but every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs. When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.
Id. at 261, 102 S.Ct. 1051 (emphasis added). Freshway and the Gilardis get no pass on this rule merely because the companies are solely owned by the Gilardis. Lee and other like authorities show that Appellants’ claim on the merits is spurious.
I. Standing
A. The Companies Have No Standing to Pursue a Cause of Action Under RFRA
Although the Supreme Court has long recognized Free Exercise protection for individuals and religious organizations, “the nature, history, and purpose” of the Clause counsel against extending the right to nonreligious corporate entities. See First Nat’l Bank of Boston v. Bellotti 435 U.S. 765, 778 n. 14, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); Grote v. Sebelius, 708 F.3d 850, 857 (7th Cir.2013) (Rovner, J., dissenting) (“General business corporations do not, separate and apart from the actions or belief systems of their individual owners or employees, exercise religion.” (quoting Hobby Lobby Stores, Inc. v. Sebelius, 870 F.Supp.2d 1278, 1291 (W.D.Okla.2012))); see also Conestoga Wood Specialties Corp. v. Sec’y of U.S. Dep’t of Health & Human Servs., 724 F.3d 377, 384 (3d Cir.2013) (“Citizens United [v. FEC, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010),] is ... grounded in the notion that the Court has a long history of protecting corporations’ rights to free speech.... [T]here is [not] a similar history of courts providing free exercise protection to corporations.”).
The dispositive point here is that while general business corporations may engage in expression related to their business interests, independent of their owners’ interests, general business corporations “do not pray, worship, observe sacraments or take other religiously-motivated actions separate and apart from the intention and direction of their individual actors.” Grote, 708 F.3d at 857 (Rovner, J., dissenting) (quoting Hobby Lobby, 870 F.Supp.2d at 1291). Therefore, “[r]eligious exercise is, by its nature, one of those ‘purely, personal’ matters referenced in [Bellotti, 435 U.S. at 778 n. 14, 98 S.Ct. 1407] which is not the province of a general business corporation.” Id. Freshway has conceded that it is not a religious organization for purposes of the Free Exercise Clause; therefore, the companies have no standing to pursue a claim under RFRA.
*1228 B. The Owners of the Companies Have Standing in This Case to Pursue a Cause of Action Under RFRA
Unlike Freshway, the Gilardis satisfy the requirements of Article III and are not barred for want of standing from pursuing a cause of action under RFRA.
The Government argues that
Plaintiffs cannot circumvent the distinction between religious organizations and secular companies by attempting to shift the focus of the RFRA inquiry from Freshway Foods to the Gilardis, who are the corporations’ controlling shareholders.... The[ ] obligations [of the Affordable Care Act] lie with the corporations themselves. The Gilardis cannot even establish standing to challenge the contraceptive-coverage requirement, much less demonstrate that the requirement may be regarded as a substantial burden on their personal exercise of religion.
Br. for the Appellees at 24 (emphasis added). It appears that the Government has conflated the requirements of Article III standing with the merits of the Gilardis’ claim under RFRA. Indeed, apart from the foregoing passing reference to “standing,” the Government never bothers to address the requirements of Article III. Rather, it rests principally on its claim that an action to redress injuries to a corporation cannot be maintained by a stockholder in his own name. Id. at 25.
To satisfy Article Ill’s standing requirements, a plaintiff must show that (1) he or she has suffered an “injury in fact” that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The Gilardis easily satisfy these requirements.
As the sole owners of the companies, the Gilardis are inextricably tied to Freshway. They therefore suffer injury in fact because they cannot operate their businesses according to their faith. Br. of Appellants at 16-17. Furthermore, the Gilardis injury is imminent and concrete, it is caused by the Mandate, and it will be redressed by a favorable judicial decision. Therefore, the Gilardis have Article III standing to pursue a cause of action under RFRA.
It is true that when a plaintiffs asserted injury is based on governmental regulation of a third party, proof of standing may be problematic. See, e.g., Allen v. Wright, 468 U.S. 737, 758-59, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-46, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); Nat’l Wrestling Coaches Ass’n v. Dep’t of Educ., 366 F.3d 930, 938-39 (D.C.Cir.2004). This is because the necessary elements of causation and redressability in such a case rest on the independent choices of the regulated third party. As such, “it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.” Defenders of Wildlife, 504 U.S. at 562, 112 S.Ct. 2130. There is no such third-party standing problem with respect to the Gilardis’ claim.
This case presents a situation in which a for-profit corporation is fully owned by two related shareholders. Freshway and the shareholder-owners are separate legal entities, but are otherwise inextricably connected. The Gilardis control the corporations and feel a concomitant responsibility to manage the companies’ business activi *1229 ties consistent with their Catholic faith. This connection between the Government Mandate and Freshway’s conduct leaves little doubt regarding the requirements of causation and redressability under Article III. We have upheld standing in cases involving Government regulation of third parties where the connection between the Government action and the third-party conduct was less clear than it is in this case. See, e.g., Tozzi v. U.S. Dep’t of Health & Human Servs., 271 F.3d 301, 309-10 (D.C.Cir.2001) (holding that the Government’s addition of dioxin to the list of known carcinogens caused municipalities and companies to reduce or end their use of PVC plastic produced by the plaintiff-manufacturer, and that a decision setting aside the Government’s action likely would give redress to the manufacturer). There is no question here that the Mandate compels Freshway to take action that the Gilardis challenge under RFRA. Therefore, causation and redressability are satisfied.
Finally, because RFRA provides that “[standing to assert a claim or defense under [the Act] shall be governed by the general rules of standing under article III of the Constitution,” 42 U.S.C. § 2000bb-1(c), the Gilardis clearly have met the only requirements for standing that are set forth in RFRA.
The Government ignores the requirements of Article III standing and, instead, rests its argument on “the bedrock principle that a corporation is ‘a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs.’ ” Br. for the Appellees at 26 (citing Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001)). Apparently, the Government means to suggest that this “bedrock principle” effectively forecloses the Gilardis’ standing to pursue a claim under RFRA. Or, to put it another way, the Government seems to contend that the cited principle is the foundation for a prudential rule that limits a claimant’s right to pursue a cause of action under RFRA even when the claimant has satisfied the requirements of Article III. The Government cites no Supreme Court authority to support this proposition, and I can find none.
First, contrary to the Government’s argument, the general rule relating to shareholder suits is not inviolate. As the Supreme Court noted in Franchise Tax Board of California v. Alcan Aluminium Limited, there is “an exception to this rule allowing a shareholder with a direct, personal interest in a cause of action to bring suit even if the corporation’s rights are also implicated.” 493 U.S. 331, 336, 110 S.Ct. 661, 107 L.Ed.2d 696 (1990). The Gilardis’ claim under RFRA asserts a cause of action in their own right for an alleged denial of their exercise of religion. This does not offend the shareholder standing rule.
Second, although the Government does not explicitly assert that the shareholder standing rule is a prudential standing requirement, the Sixth Circuit reached this conclusion in Autocam Corporation v. Sebelius, 730 F.3d 618 (6th Cir.2013). While recognizing that RFRA provides only that the Article III requirements must be met for standing, the Sixth Circuit nonetheless concluded that prudential requirements must also be satisfied. The Autocam decision first points out that “ ‘Congress legislates against the background of [the Supreme Court’s] prudential standing doctrine, which applies unless it is expressly negated.’ ” Id. at 623 (quoting Bennett v. Spear, 520 U.S. 154, 163, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)). The decision then goes on to say that, because “RFRA makes no mention *1230 of prudential standing” nor states “that Article III constitutes the exclusive set of requirements for standing,” prudential standing requirements must apply in RFRA cases in addition to Article III requirements. Id. Finally, the decision holds that the shareholder standing rule is an established component of prudential standing doctrine. Id. I respectfully disagree.
Autocam cites Franchise Tax in support of the proposition that the shareholder standing rule is a component of prudential standing doctrine. But Franchise Tax merely stated that “we think” the “shareholder standing” rule is “related to” the principle of prudential standing that requires a plaintiff to assert his own legal interests. 493 U.S. at 336, 110 S.Ct. 661. Franchise Tax did not actually rely on the shareholder standing rule to conclude that the plaintiff lacked standing. Id. at 338, 110 S.Ct. 661. We can find no Supreme Court decision applying the shareholder standing rule to uphold the dismissal of a party’s law suit for want of “prudential standing,” nor can we find a decision citing Franchise Tax for this general idea.
Autocam’s reliance on Bennett v. Spear also seems misplaced. In Bennett, the prudential standing doctrine to which the Court was referring was the “zone of interest” test, not the shareholder standing rule. 520 U.S. at 162-63, 117 S.Ct. 1154. In many cases involving challenges to administrative agency actions, in addition to determining whether a petitioner has Article III standing, a court must also determine “whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.” Ass’n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The zone of interest inquiry, which is “basically one of interpreting congressional intent,” Clarke v. Sec. Indus. Ass’n, 479 U.S. 388, 394, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987), is a prudential requirement that applies unless expressly negated by Congress. See Bennett, 520 U.S. at 163, 117 S.Ct. 1154. There is not the slightest doubt in this case that the Gilardis’ cause of action is within the zone of interests protected by RFRA.
As already noted, the Autocam decision rests in part on the assumption that “Congress did not remove [the] prudential [shareholder] standing limitations when it enacted RFRA.” 730 F.3d at 623. This reasoning is fallacious because neither the Government nor the Sixth Circuit cites any authority holding that the shareholder standing rule was a prudential limitation governing Free Exercise claims before the enactment of RFRA. Since the Supreme Court has never held that such a prudential standing requirement limits who may pursue Free Exercise claims, it is a non sequitur to say that “Congress legislates against the background of [the Supreme Court’s] prudential standing doctrine.” Id. (alterations in original).
Third, Bennett makes clear that prudential standing can be negated by Congress. If there were any prudential standing requirements applicable to Free Exercise claims before the enactment of RFRA, Congress eliminated them when RFRA was passed. In Bennett, the Court held that a statutory provision stating that “any person may commence a civil suit” was sufficient to make it clear that any party who satisfied the requirements of Article III could bring suit to challenge an agency action under the statute. 520 U.S. at 164, 117 S.Ct. 1154. The holding in Bennett controls the disposition in this case with respect to prudential standing. RFRA tellingly states that “[standing to assert a claim or defense ... shall be governed by the general rules of standing under article *1231 III of the Constitution.” 42 U.S.C. § 2000bb-l(c). The phrase “shall be governed by” makes it plain that Article III, and nothing more, controls with respect to claims under RFRA.
In sum, I agree with the majority that the Gilardis have standing to pursue a claim under RFRA. It is important to note, however, that the Gilardis’ standing rests on their inextricable ties to Freshway. The companies are operated as an extension of the two owners’ religious beliefs; there are no minority shareholders with different views. Thus, the cognizable constitutional injury — an alleged encroachment on personal religious exercise — only exists in this case because the Gilardis’ fully-owned companies are a vehicle by which they express their personal religious views, e.g., they direct delivery trucks to display bumper stickers conveying “their religious views regarding the sanctity of human life to the public.” Br. of Appellants at 11-12.
The Mandate applying to their companies touches the Gilardis’ religious exercise rights under RFRA. The touching is not substantial, but it is sufficient to satisfy the requirements of Article III. The merits of the Gilardis’ claim under RFRA is quite another matter, however.
II. Free Exercise Jurisprudence
A. First Principles: The Limited Reach of the Free Exercise Clause
Through the entire history of Free Exercise jurisprudence, the Supreme Court has remained true to the principle that the Free Exercise Clause does not ensure freedom from any regulation to which a party holds a religious objection. Indeed, the Court has consistently recognized that any such rule would be problematic because it “would place beyond the law any act done under claim of religious sanction.” Cleveland v. United States, 329 U.S. 14, 20, 67 S.Ct. 13, 91 L.Ed. 12 (1946); accord Reynolds, 98 U.S. at 167 (“To permit this would ... in effect ... permit every citizen to become a law unto himself. Government could exist only in name under such circumstances.”).
In early cases, the Supreme Court routinely held that religious activities must be subordinate to general public welfare legislation. Mormons were thus not exempt for the sake of religious exercise from laws criminalizing polygamy. Reynolds, 98 U.S. at 145; Cleveland, 329 U.S. at 20, 67 S.Ct. 13. A child who wished to distribute religious literature with her family was not exempt from child labor laws. Prince v. Massachusetts, 321 U.S. 158, 167, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (“[T]he state has a wide range of power for limiting parental freedom and authority in things affecting the child’s welfare; and that includes, to some extent, matters of conscience and religious conviction.”). And in Braunfeld v. Brown, the Court upheld the application of a Sunday closing law to Jewish merchants who observed the Sabbath on Saturday, even though the law “ma[de] the practice of their religious beliefs more expensive” by forcing them to close two days a week. 366 U.S. at 605, 81 S.Ct. 1144; accord McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). The Sunday closing law was intended to establish a “day of community tranquility, respite and recreation” for the general well-being of citizens, Braunfeld, 366 U.S. at 602, 81 S.Ct. 1144, and “[t]o strike down ... legislation which imposes only an indirect burden on the exercise of religion ... would radically restrict the operating latitude of the legislature.” Id. at 606, 81 S.Ct. 1144.
When one studies the history of Free Exercise jurisprudence in the United States, it is inescapable that the Free Exercise Clause of the First Amendment has been narrowly defined for good reasons. *1232 This point was amplified by Justice O’Con-nor in Lyng:
However much we might wish that it were otherwise, government simply could not operate if it were required to satisfy every citizen’s religious needs and desires. A broad range of government activities — from social welfare programs to foreign aid to conservation projects — will always be considered essential to the spiritual well-being of some citizens, often on the basis of sincerely held religious beliefs. Others will find the very same activities deeply offensive, and perhaps incompatible with their own search for spiritual fulfillment and with the tenets of their religion. The First Amendment must apply to all citizens alike, and it can give to none of them a veto over public programs that do not prohibit the free exercise of religion. The Constitution does not, and courts cannot, offer to reconcile the various competing demands on government, many of them rooted in sincere religious belief, that inevitably arise in so diverse a society as ours. That task, to the extent that it is feasible, is for the legislatures and other institutions.
485 U.S. at 452, 108 S.Ct. 1319.
B. The Evolution of the Substantial Burden/Compelling Governmental Interest Test During the Twenty-seven Years from Sherbert to Smith
RFRA states in relevant part:
(a) In general
Government shall not substantially burden a person’s exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.
(b) Exception
Government may substantially burden a person’s exercise of religion only if it demonstrates that application of the burden to the person—
(1) is in furtherance of a compelling governmental interest; and
(2) is the least restrictive means of furthering that compelling governmental interest.
42 U.S.C. § 2000bb-l.
RFRA was enacted to overturn the Supreme Court’s decision in Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), which had vitiated the substantial burden/compelling governmental interest test enunciated in Sherbert, 374 U.S. 398, 83 S.Ct. 1790. See 42 U.S.C. § 2000bb(b)(l) (stating that a purpose of the statute is “to restore the compelling interest test as set forth in” Sherbert). It is also undisputed that, in passing RFRA, Congress meant to restore the entire body of Free Exercise jurisprudence that developed during the twenty-seven years following the Court’s decision in Sherbert up until the Court’s decision in Smith. See, e.g., S. Rep. No. 103-111, at 8-9 (1993), reprinted in 1993 U.S.C.C.A.N. 1892, 1898; H.R. Rep. No. 103-88, at 6-7 (1993). An examination of the relevant case law during these twenty-seven years confirms that, when it enacted RFRA, Congress never meant to abandon the first principles that have historically limited the reach of the Free Exercise Clause.
The compelling interest framework was first articulated in Sherbert, where the Court held that South Carolina violated the plaintiffs Free Exercise rights when it denied her unemployment benefits on the grounds that observing the Sabbath did not constitute “good cause” for declining work on Saturday. 374 U.S. at 400-01, 83 S.Ct. 1790. The Court explained that the state must show a compelling interest for refusing to accommodate the plaintiffs Sabbath observance. Sherbert cited Braunfeld approvingly. Unlike Sherbert, Braunfeld involved a situation *1233 in which there was “a strong state interest in providing one uniform day of rest for all workers,” and “[Requiring exemptions for Sabbatarians ... appeared to present an administrative problem of such magnitude, or to afford the exempted class so great a competitive advantage, that such a requirement would have rendered the entire statutory scheme unworkable.” Id. at 408-09, 83 S.Ct. 1790. In Sherbert, however, as the Court later explained, the Government acted pursuant to a statutory scheme that created “a mechanism for individualized exemptions.” Bowen v. Roy, 476 U.S. 693, 708, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986). When a “state creates such a mechanism, its refusal to extend an exemption to an instance of religious hardship ... tends to exhibit hostility, not neutrality, towards religion.” Id.
In the majority of the Free Exercise cases decided during the twenty-seven years following Sherbert, the Court applied this compelling interest framework to hold either (a) that there was no substantial burden on religious exercise, or (b) that the burden was justified by the Government’s interest in administering a statutory scheme that, by its nature, required uniform enforcement in order to be administrable. The Court amplified these lines of analysis in Lee.
In Lee, the Court upheld the Government’s application of Social Security taxes to an Amish employer who held a religious objection to the Social Security system. Accepting the plaintiffs “contention that both payment and receipt of social security benefits is forbidden by the Amish faith,” the Court concluded that Social Security taxes imposed a substantial burden on Lee’s Free Exercise. 455 U.S. at 257, 102 S.Ct. 1051. Nonetheless, the Court found the burden justified because in Lee, as in Braunfeld, uniform application of the law was necessary to make general public welfare regulations administrable: “[Mjandatory participation [by all covered employers and employees] is indispensable to the fiscal vitality of the ... system,” id. at 258, 102 S.Ct. 1051, and “[t]he tax system could not function if denominations were allowed to challenge [it] because tax payments were spent in a manner that violates their religious belief.” Id. at 260, 102 S.Ct. 1051.
In at least six more Free Exercise cases decided during the twenty-seven years post-Sherbert, the Court applied the substantial burden/compelling governmental interest framework to hold that the disputed Government action or regulation imposed no substantial burden, or that the burden was justified under the reasoning in Lee and Braunfeld:
• Gillette v. United States, 401 U.S. 437, 461 [91 S.Ct. 828, 28 L.Ed.2d 168] (1971) (the Military Selective Service Act, exempting persons who oppose participating in war generally, but not those who hold religious objections to a particular war, does not violate Free Exercise) (“Our cases do not at their farthest reach support the proposition that a stance of conscientious opposition relieves an objector from any colliding duty fixed by a democratic government.”).
• Bob Jones Univ. v. United States, 461 U.S. 574, 603-04 [103 S.Ct. 2017, 76 L.Ed.2d 157] (1983) (denying tax-exempt status to a religious school that practiced racial discrimination as part of a religious belief against interracial dating and marriage did not violate Free Exercise) (“Th[e] governmental interest [in eradicating racial discrimination] substantially outweighs whatever burden denial of tax benefits places on petitioners’ exercise of their religious beliefs.” (citing Lee, 455 U.S. at 259-60 [102 S.Ct. 1051]; Prince, 321 *1234 U.S. at 170 [64 S.Ct. 438]; Gillette, 401 U.S. 437 [91 S.Ct. 828]; and Reynolds, 98 U.S. 145)).
• Hernandez v. Comm’r, 490 U.S. 680, 698 [109 S.Ct. 2136, 104 L.Ed.2d 766] (1989) (denying tax deductible status to fees paid for training sessions that were “the central practice of Scientology” did not violate Free Exercise); id. at 699-700 [109 S.Ct. 2136] (“Lee establishes that even a substantial burden would be justified by the ‘broad public interest in maintaining a sound tax system,’ free of ‘myriad exceptions flowing from a wide variety of religious beliefs.’ ” (quoting Lee, 455 U.S. at 260, 102 S.Ct. 1051)).
• Tony & Susan Alamo Found. v. Sec’y of Labor, 471 U.S. 290, 303 [105 S.Ct. 1953, 85 L.Ed.2d 278] (1985) (the Fair Labor Standards Act did not burden the religious exercise of a non-profit religious organization or its “associates,” who received food and shelter in exchange for work carrying out the organization’s commercial enterprises).
• Bowen, 476 U.S. at 706-07 [106 S.Ct. 2147] (rejecting a claim that using a social security number to administer Government programs violated the Free Exercise of Native Americans who believed the number would impair their child’s spirit) (“[T]he nature of the burden is relevant to the standard the government must meet to justify the burden.... [Administration of complex [benefits] programs requires certain conditions and restrictions. Although in some situations, a mechanism for individual consideration will be created, a policy decision ... to treat all applicants alike and ... not ... to become involved in case-by-case inquiries into the genuineness of each religious objection ... is entitled to substantial deference.” (citing Thomas v. Review Bd. of Ind. Emp’t Sec. Div., 450 U.S. 707, 717-18 [101 S.Ct. 1425, 67 L.Ed.2d 624] (1989); Sherbert, 374 U.S. at 404 [83 S.Ct. 1790])).
• Lyng, 485 U.S. at 442 [108 S.Ct. 1319] (no substantial burden on religious exercise even though building a road across a stretch of national forest that would “cause serious and irreparable damage to the sacred areas which are an integral and necessary part of the belief systems and lifeway” of the Native American tribes); id. at 450-51 [108 S.Ct. 1319] (“[Sherbert] does not and cannot imply that incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require government to bring forward a compelling justification.... ”).
During this same twenty-seven year period, the Court found Free Exercise violations only when the disputed governmental policy allowed for individualized or discrete exemptions, and the state declined to grant exemptions or exceptions to accommodate religious beliefs. Three of the four successful Free Exercise cases, like Sherbert, presented a discretionary decision as to whether the plaintiff had “good cause” for refusing employment that conflicted with their religious practice. Thomas, 450 U.S. 707, 101 S.Ct. 1425 (claimant denied unemployment benefits because he refused a job assembling weapons on the grounds of a religious objection); Hobbie v. Unemployment Appeals Comm’n of Fla., 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987) (claimant was denied unemployment benefits because of refusal to work on the Sabbath); Frazee v. Ill. Dep’t of Emp’t Sec., 489 U.S. 829, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989) (claimant denied unemployment benefits because he refused to work on Sunday).
*1235 In the fourth case, Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Court held that the state lacked a compelling interest in requiring Amish families to send their children to school for the ninth and tenth grades. The Court reiterated that “[i]t is true that activities of individuals, even when religiously based, are often subject to regulation ... to promote the health, safety, and general welfare.” Id. at 220, 92 S.Ct. 1526 (citing Gillette, 401 U.S. 437, 91 S.Ct. 828; Braunfeld, 366 U.S. 599, 81 S.Ct. 1144; Prince, 321 U.S. 158, 64 S.Ct. 438; Reynolds, 98 U.S. 145). But it concluded that the state had not shown why its educational objectives required Amish children to attend “an additional one or two years of formal high school ... in place of their long-established program of informal vocational education.” Id. at 222, 92 S.Ct. 1526. In other words, there was no demonstrated need for a uniform attendance rule. Indeed, the accommodation sought by the Amish was not at odds with the state’s objective of ensuring meaningful education for minors. Therefore, the Court concluded that the Government simply had not shown that the state’s educational objectives would be compromised by granting a discrete exemption for Amish students.
In sum, a careful reading of the Supreme Court’s Free Exercise decisions during the twenty-seven years post-£%erbert shows that Free Exercise challenges to generally applicable, neutral Government policies were rarely successful. See Michael W. McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409, 1417 (1990) (“Since 1972, the Court has rejected every claim for a free exercise exemption to come before it, outside the narrow context of unemployment benefits governed strictly by Sherbert.” (footnotes omitted)).
C. Congress’ Enactment of RFRA in Reaction to Smith: Restoration of the Substantial Burden/Compelling Governmental Interest Test
After twenty-seven years of consistently applying the substantial burden/compelling governmental interest framework to decide eases arising under the Free Exercise Clause, the Supreme Court inexplicably discarded this analytical framework in Smith, 494 U.S. 872, 110 S.Ct. 1595. The reaction from Congress was swift and clear.
In Smith, the Court held that criminalizing the use of peyote did not violate the free exercise of Native American sects that traditionally used the hallucinogen during religious ceremonies. The Court did not require the state to provide a compelling justification for denying an exemption, stating that the Sherbert compelling interest test was “inapplicable” to “an across-the-board criminal prohibition on a particular form of conduct.” Id. at 884-85, 110 S.Ct. 1595. While pre-Smith cases had often applied the compelling interest framework to conclude that a claimant’s religious exercise was not substantially burdened, or that the Government’s compelling interest justified any burden, Smith went a step further by eliminating this framework entirely.
In response to Smith, Congress enacted RFRA. The statute notes that “the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion.” 42 U.S.C. § 2000bb(a)(4). It then states that the purpose of RFRA is to “restore the compelling interest test as set forth” in Sherbert and Yoder and to “guarantee its application in all cases where free exercise of religion is substantially burdened.” Id. § 2000bb(b)(l).
*1236 Reports from both houses make clear that Congress sought to restore the entire body of Free Exercise jurisprudence as it existed during the twenty-seven years post-Sherbert. S. Rep. No. 103-111, at 9 (“Pre-Smith case law makes it clear that only governmental actions that place a substantial burden on the exercise of religion must meet the compelling interest test.... The act thus would not require such a justification for every government action that may have some incidental effect on religious institutions.... [T]he compelling interest test generally should not be construed more stringently or more leniently than it was prior to Smith.”)-, H.R.Rep. No. 103-88, at 7 (“This bill is not a codification of any prior free exercise decision but rather the restoration of the legal standard that was applied in those decisions---- [T]he [compelling interest] test generally should not be construed more stringently or more leniently than it was prior to Smith.”)-, 139 Cong. Rec. S26178 (daily ed. Oct. 26, 1993) (statement of Sen. Kennedy) (“Not every free exercise claim will prevail, just as not every claim prevailed prior to the Smith decision”). Indeed, RFRA itself says that “the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.” 42 U.S.C. § 2000bb(a)(5) (emphasis added).
Senator Hatch, a sponsor of RFRA, explained that the bill was amended to add the word “substantial” before “burden” so as to be “consistent with the case law developed by the Court prior to the Smith decision” that “does not require the Government to justify every action that has some effect on religious exercise.” 139 Cong. Rec. S26180 (daily ed. Oct. 26, 1993) (statement of Sen. Hatch).
Since the passage of RFRA, the Supreme Court has confirmed that, as Congress intended, RFRA reinstates the full body of pre-Smith jurisprudence. In Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006), the Court held that declining to permit a “Christian Spiritist” sect’s sacramental use of hoasca, a hallucinogenic tea prohibited by the Controlled Substances Act, violated Free Exercise under RFRA. The Government conceded that prohibiting the sect from using hoasca imposed a substantial burden on the group’s religious exercise. Id. at 426, 126 S.Ct. 1211. The Court made clear that the principles of Braunfeld and Lee still apply under RFRA, explaining that “the Government can demonstrate a compelling interest in uniform application of a particular program by offering evidence that granting the requested religious accommodations would seriously compromise its ability to administer the program.” Id. at 435, 126 S.Ct. 1211.
Applying these principles, the Court concluded that the Government failed to prove that the Controlled Substances Act required uniform application in order to be administrable. Critical to this conclusion was the fact that the Controlled Substances Act authorized the Attorney General to “‘waive the requirement for registration of certain manufacturers, distributors, or dispensers if he finds it consistent with the public health and safety.’ ” Id. at 432, 126 S.Ct. 1211 (quoting 21 U.S.C. § 822(d)). Furthermore, the Act granted an exemption to all members of Native American tribes for the sacramental use of peyote. Id. at 433, 126 S.Ct. 1211. “The well-established peyote exception also fatally undermines the Government’s broader contention that the Controlled Substances Act establishes a closed regulatory system that admits of no exceptions under RFRA.” Id. at 434, 126 S.Ct. 1211. O Centro easily fits within the body of Free Exercise cases decid *1237 ed during the twenty-seven years post-Sherbert.
III. The Mandate Does Not Substantially Burden Appellants’ Religious Objections to the Use of Contraceptive Products
Requiring Freshway’s health plan to cover contraceptive products does not substantially burden the Gilardis’ personal objection to using contraception. The Gilardis have standing in this case only because of the alleged injuries that arise from the Mandate’s application to their companies, not to them. Their alleged injuries are sufficient to satisfy the requirements of Article III, but they have failed to show that the Mandate substantially burdens their personal religious activities.
There are three reasons why the Mandate does not substantially burden the Gilardis’ “exercise of religion.” First, the Mandate does not require the Gilardis to use or purchase contraception themselves. Second, the Mandate does not require the Gilardis to encourage Freshway’s employees to use contraceptives any more directly than they do by authorizing Freshway to pay wages. Finally, the Gilardis remain free to express publicly their disapproval of contraceptive products.
Because the Mandate does not require the Gilardis to personally engage in conduct prohibited by their religious beliefs, this case differs from every case in which the Court has found a substantial burden on religious exercise. In 0 Centro and Yoder, for instance, there was no dispute as to whether the regulations substantially burdened the plaintiffs’ religious exercise. The disputed Government policies in those cases very plainly prevented the plaintiffs, personally, from engaging in their religious practices (using hoasca and homeschooling one’s children), and the only question was whether the burdens were justified.
In contrast, the Gilardis cannot claim that they are being forced to use contraceptives, which would directly conflict with their religious beliefs. Rather, they complain that because their companies are required to purchase insurance that includes coverage for contraception, they as owners are enabling third parties to engage in conduct that they oppose. This is a specious claim. The Gilardis can find no support for their position in the controlling case precedents. No Free Exercise decision issued by the Supreme Court has recognized a substantial burden on a plaintiffs religious exercise where the plaintiff is not himself required to take or forgo action that violates his religious beliefs, but is merely required to take action that might enable other people to do things that are at odds with the plaintiffs religious beliefs.
Furthermore, the Mandate does not require the Gilardis to directly facilitate employees’ use of contraception. The Gilardis do not contend that their religious exercise is violated when Freshway pays wages that employees might use to purchase contraception, and the Mandate does not require the Gilardis to facilitate the use of contraception any more directly than they already do by authorizing Freshway to pay wages. Amici supporting the Gilardis’ position attempt in vain to distinguish between the Mandate and paying wages. First, they argue that the Mandate requires the Gilardis to become an “essential cause” of increasing the number of employees who use contraception. Br. of 28 Catholic Theologians and Ethicists at 22-23. But the Gilardis are no more of an “essential cause” of increasing the use of contraception when they authorize Freshway to pay for a benefits plan that employees might use to *1238 get contraception than they are when they authorize wages that an employee might use to purchase contraception she would not otherwise be able to afford.
Amici also attempt to distinguish between the Mandate and paying wages by arguing that covering contraceptive products is akin to the difference between giving an underage person a “gift certificate” to buy beer, and giving him money that he might spend on beer. Id. at 21-22. But this analogy fails. Health coverage under the Mandate is not like giving a gift certificate to buy beer specifically, but more like a gift certificate to a supermarket where the recipient may purchase whatever is available, including beer. Just as the Government does not directly encourage religion when it provides vouchers that recipients may choose to spend on religious schools, the Gilardis do not directly encourage the use of contraception when they provide insurance coverage that recipients may choose to spend on contraceptives. Zelman v. Simmons-Harris, 536 U.S. 639, 652, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002) (“The incidental advancement of a religious mission, or the perceived endorsement of a religious message, is reasonably attributable to the individual recipient, not to the [party granting the benefits], whose role ends with the disbursement of benefits.”).
Amici also contend that the difference between the Mandate and paying wages is akin to the difference between a person who opposes the death penalty being required to pay taxes that fund executions, and being required to “purchase the drugs for a lethal injection and personally deliver them to the facility where the execution will take place.” Br. of 28 Catholic Theologians and Ethicists at 19. The problem with this rather extraordinary example is that the Mandate does not require the Gilardis to have nearly this degree of personal involvement in providing contraceptives. The Mandate does not require the Gilardis to transfer funds from Freshway’s accounts directly to the manufacturers or retailers of contraception. Nor are the companies required to deliver or distribute contraception to employees. Under the Employee Retirement Income Security Act, 29 U.S.C. § 1132(d)(1), Freshway is a distinct legal entity from its self-insured group health plan. The plan is operated by a third-party administrator, and, pursuant to health privacy regulations, the Gilardis are actually prohibited from being informed whether individual employees purchase contraceptive products, or about any other information regarding employees’ health care decisions. See Br. of Americans United for Separation of Church and State, et al., at 29-30 (citing 45 C.F.R. § 164.508; 45 C.F.R. § 164.510). Moreover, the Gilardis are free to procure Mandate-compliant coverage for their employees through an entirely independent, third-party insurance carrier, rather than administering their own group health plan. Id. This is a far cry from personally purchasing contraceptives and delivering them to employees.
Finally, the Gilardis suggest that because Freshway is required to offer health insurance that includes contraception, they as owners are being pressed to effectively endorse the use of contraception. This claim fails because the Supreme Court has held that a party’s First Amendment rights are not violated when he must comply with a Government policy that sends a message contrary to his beliefs. Hence, an institute of higher education may be required to host military recruiters on campus, even if it strongly opposes military policy. See Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006). Parties who comply with a regulation contrary to their beliefs “remain[ ] free to disassociate [themselves] from *1239 those views.” Id. at 65, 126 S.Ct. 1297 (citation omitted). The Gilardis likewise remain free to “disassociate” themselves from any message that might suggest that they endorse contraception. They may denounce publicly the use of contraception, for instance, by issuing a statement to Freshway’s employees expressing their disapproval of the Mandate and contraception; and they are free to continue authorizing Freshway to display slogans on company delivery trucks expressing their views about the sanctity of human life. There are countless ways the Gilardis can make clear that their involuntary compliance with federal law does not signify that they endorse the use of contraception. See Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed.Reg. 8725, 8729 (Feb. 15, 2012) (“Nothing in these final regulations precludes employers or others from expressing their opposition, if any, to the use of contraceptives, requires anyone to use contraceptives, or requires health care providers to prescribe contraceptives if doing so is against their religious beliefs.”).
For the foregoing reasons, the Gilardis simply cannot establish that the Mandate substantially burdens their personal objection to contraception. The Mandate does not regulate the Gilardis; it regulates their companies. So the Mandate requires nothing of the Gilardis, save what is required of any managers of business operations subject to federal law. And we do not normally assume that managers of for-profit companies are personally affronted by the requirements of federal law.
More particularly, the Mandate does not require the Gilardis to use or purchase contraception themselves; it does not require them to facilitate Freshway’s employees’ use of contraceptives any more directly than they do by authorizing Freshway to pay wages; and they remain free to publicly express their disapproval of contraceptive products. Because the Gilardis cannot show a substantial burden on their personal religious exercise, they cannot prevail on the merits of their RFRA claim as a matter of law. I would therefore affirm the District Court’s denial of a preliminary injunction on this ground, without inquiring into whether the Mandate serves a compelling governmental interest.
IV. Compelling Governmental Interests Justify the Mandate
Even though I would deny the preliminary injunction on the ground that the Gilardis cannot show that the Mandate substantially burdens their exercise of religion, I will also address the Government’s compelling interests in order to respond to my colleagues’ opinion on this point.
In O Centro, the Court made clear that “the Government can demonstrate a compelling interest in uniform application of a particular program by offering evidence that granting the requested religious accommodations would seriously compromise its ability to administer the program.” 546 U.S. at 435, 126 S.Ct. 1211. The Government has met this test in defending the Mandate. The Mandate therefore satisfies the compelling interest test under O Centro, Lee, Braunfeld, and Hernandez.
The Mandate obviously serves the compelling interests of promoting public health, welfare, and gender equality. Br. for the Appellees 38-40. See, e.g., Bd. of Dirs. of Rotary Int’l v. Rotary Club of Duarte, 481 U.S. 537, 549, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987) (“Even if [the Act] does work some slight infringement on [plaintiffs’] right of expressive association, that infringement is justified because it serves the State’s compelling interest in eliminating discrimination against worn- *1240 en.”); Roberts v. U.S. Jaycees, 468 U.S. 609, 626, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (“Assuring women equal access to ... goods, privileges, and advantages clearly furthers compelling state interests.”); Prince, 321 U.S. 158, 64 S.Ct. 438 (upholding child labor laws); Olsen v. DEA, 878 F.2d 1458, 1462 (D.C.Cir.1989) (upholding laws regulating drug use).
Contraceptive products are used for health care purposes beyond preventing unwanted pregnancy. They are prescribed to prevent disease. Contraceptives reduce the risk of ovarian, endometrial, and gynecologic cancers. See Br. of the Ovarian Cancer Nat’l Alliance, et al. at 5-25 (describing how the Mandate is based, in part, on ensuring that women have access to cancer-preventative benefits unrelated to preventing pregnancy). Contraceptives and sterilization also preserve the health of adult women with diabetes, lupus, and heart conditions, who would be at physical risk if they became pregnant. See Br. of Nat’l Health Law Program, et al. at 7-13.
Coverage for contraceptive products eliminates gender discrimination because the cost of contraception falls disproportionately on women, and the costs of health care are generally much higher for women than men. Br. for the Appellees at 41 (“Congress found that ... ‘women of childbearing age spend 68 percent more in out-of-pocket health care costs than men.’ ” (quoting 155 Cong. Reo. S28843 (daily ed. Dec. 1, 2009) (statement of Sen. Gillibrand))). Gender inequality in the cost of health care is caused, in part, by the fact that many health services specific to women have historically been excluded from insurance coverage. See Br. for Nat’l Women’s Law Center, et al. at 7 (“Congress intended ... to help alleviate the ‘punitive practices of insurance companies that charge women more and give [them] less in benefits.’ ” (quoting 155 Cong. Rec. S28842 (Dec. 1, 2009) (statement of Sen. Mikulski))).
Furthermore, it is critical to the functioning of the Affordable Care Act’s statutory scheme that exemptions from the Mandate are, like exemptions from the Social Security tax, extremely limited. Allowing religious exemptions to for-profit, secular corporations would undermine the universal coverage scheme: If the Gilardis’ companies were exempted from covering contraception, another corporation’s owners might just as well seek a religious exemption from covering certain preventative vaccines. A Christian Scientist, whose religion has historically opposed conventional medical treatment, might claim that his corporation is entitled to a religious exemption from covering all medical care except healers who treat medical ailments with prayer. Paul Vitello, Christian Science Seeks Truce with Modem Medicine, N.Y. Times, Mar. 24, 2010, at A20, available at http://www.nytimes.com/2010/03/24/ nyregion/24heal.html?pagewanted=all&_ r=0 (last visited Oct. 13, 2013). Muslim or Jewish business owners might claim a religious exemption from covering any medication derived from pork products (for instance, the gelatin used to make capsules or coating of many pills). S. Pirzada Sattar & Debra A. Pinals, Letter to the Editor, When Taking Medications Is a Sin, 53 Psychiatric Services 213 (2002), available at http://journals.psychiatry online.org/article.aspx?Volume=53& page=213&journalID=18 (last visited Oct. 13, 2013). Just as in Lee and Braunfeld, “[t]he whole point of ... a ‘uniform’ [policy] would ... be[ ] defeated by exceptions.” O Centro, 546 U.S. at 435, 126 S.Ct. 1211 (quoting Sherbert, 374 U.S. at 408, 83 S.Ct. 1790 (discussing Braunfeld, 366 U.S. at 608-09, 81 S.Ct. 1144)).
The existing exemptions to the Mandate do not establish that the Government lacks *1241 a compelling interest in enforcing it against all large, for-profit secular employers. First, the exemptions are not as broad as the Gilardis make them out to be. The exemption for grandfathered plans is temporary, intended to be a means for gradually transitioning employers into mandatory coverage. A health plan loses grandfathered status as soon as it changes its cost-sharing, benefits, or employer-contribution terms. 45 C.F.R. § 147.140(g). The Department of Health and Human Service’s “mid-range estimate” is that 66% of small employer plans and 45% of large employer plans will relinquish their grandfathered status by the end of 2013. Interim Final Rules for Group Health Plans and Health Insurance, 75 Fed.Reg. 34,538, 34,-552 (June 17, 2010).
In fact, the Gilardis voluntarily relinquished Freshway’s grandfathered status by increasing the employees’ co-payments for doctor visits. Br. for the Appellees at 43; Joint Appendix at 25. That the Gilardis voluntarily relinquished grandfathered status despite their opposition to the Mandate supports the Department’s prediction that most other employers are likely to do so in the short term, as they will inevitably modify their coverage plans to accommodate changes in the cost of health care.
Furthermore, contrary to the Gilardis’ suggestion, employers with fewer than fifty employees are not specifically exempted from the Mandate. Rather they are exempt altogether from being required to provide health coverage under the Affordable Care Act. 26 U.S.C. § 4980H(e)(2)(A). Small businesses that do elect to provide health coverage — as many do in order to offer more competitive benefits to employees and to receive tax benefits — must provide coverage that complies with the Mandate. Br. for the Appellees at 42. In other words, the Mandate would apply to the Gilardis even if they had fewer than fifty employees, so long as they chose to provide health coverage, as they contend they are committed to doing. Br. of Appellants at 13-14.
The only permanent, specific exemption from the Mandate is for religious, nonprofit employers. 45 C.F.R. § 147.130(a)(l)(iv)(B) (current rules defining religious nonprofits in terms of Internal Revenue Code status); Coverage of Certain Preventative Services Under the Affordable Care Act, 78 Fed.Reg. 8456, 8462 (Feb. 6, 2013) (proposed rules exempting any non-profit organization that holds itself out as a religious organization). This exemption for religious nonprofits surely does not undermine the Government’s position that uniform enforcement is essential to the scheme, in the way that the exemption for Native American tribes using peyote was fatal to such a claim in O Centro. In O Centro, the existing exemption for the religious use of peyote by Native American tribes was much larger than the exemption sought by the 130 members of the Christian Spiritist sect. If the Controlled Substances Act was administrable with a much larger exemption for all Native Americans, why would a smaller exemption for 130 hoasca users defeat the scheme? Furthermore, the nature of the exemption sought in O Centro — the Christian Seperatist sect’s sacramental use of hoasca — was essentially indistinguishable from the nature of the exemption that had already been granted for the Native American tribes’ sacramental use of peyote.
This case is a far cry from the situation seen in O Centro. The exemption sought by the Gilardis for secular, for-profit corporations is potentially much larger than the exemption for non-profit religious entities that exists under .the Mandate. In addition, the exemption sought in this case is fundamentally different from the exemption that has already been granted. The Court has long recognized that federal *1242 workplace regulations apply differently to secular, for-profit corporations than to non-profit religious organizations. E.g., Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC, — U.S. -, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012) (Free Exercise Clause shields a minister of a religious non-profit from being sued for violating the Americans with Disabilities Act); Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987) (Title VII’s exemption of non-profit churches from provisions prohibiting religious discrimination does not violate Establishment Clause); NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) (interpreting the National Labor Relations Act as exempting Church-operated educational institutions from National Labor Review Board’s jurisdiction). In exempting religious non-profits, thé Department of Health and Human Services reasoned that “[rjeligious accommodations in related areas of federal law, such as the exemption for religious organizations under Title VII of the Civil Rights Act of 1964, are available to nonprofit religious organizations but not to for-profit secular organizations.” Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 8456, 8462 (Feb. 6, 2013). The Americans with Disabilities Act also exempts religious non-profits, but not for-profit, secular corporations. 42 U.S.C. § 12113(d)(1), (2).
If an exemption for religious non-profits were taken as proof that the Government lacks a compelling interest in enforcing regulations against secular, for-profit corporations, this would suggest that secular corporations should likewise be entitled to religious exemptions from Title VII', the National Labor Relations Act, and the Americans with Disabilities Act. Furthermore, the Mandate’s exception for religious non-profits is nothing like the exceptions in Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), where the ordinances prohibiting animal sacrifices were so replete with exceptions that the Court concluded their purpose was “suppression of ... the Santería worship service.” Id. at 534, 113 S.Ct. 2217.
It is very important to recall that the Court in Lee rejected the argument that limited exemptions from the Social Security tax proved the Government lacked a compelling interest in uniform enforcement all for-profit employers. The Court explained that Congress was justified in “dr[awing] a line ... exempting the self-employed Amish but not all persons working for an Amish employer.” 455 U.S. at 261, 102 S.Ct. 1051. The Court’s reasoning is equally applicable here: “When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.” Id. The Court explained that “[gjranting an exemption from social security taxes to an employer operates to impose the employer’s religious faith on the employees.” Id.; accord Hernandez, 490 U.S. at 700, 109 S.Ct. 2136 (“The fact that Congress has already crafted some deductions and exemptions in the Code also is of no consequence, for the guiding principle is that a tax ‘must be uniformly applicable to all, except as Congress provides explicitly otherwise.’ ” (quoting Lee, 455 U.S. at 261, 102 S.Ct. 1051)).
Freshway, the employer in Lee, and other for-profit corporations are different from religious non-profits in that they use labor to make a profit, rather than to perpetuate a religious values-based mission. In choosing to use labor for financial gain, the corporation and its owners sub *1243 mit themselves to legislation — such as Title VII, the Fair Labor Standards Act, the Americans with Disabilities Act, and the Affordable Care Act — designed to protect the health, safety, and welfare of employees. They cannot voluntarily capitalize on labor but invoke their personal religious values to deny employees the benefit of laws enacted to promote employee welfare.
Because the Gilardis have voluntarily chosen to capitalize on labor, they have agreed to accept certain limitations on their conduct that arise from the Government’s compelling interest in securing the safety and welfare of their employees. For this reason, even if the Mandate were a substantial burden on the Gilardis’ religious exercise — which it is not — this record supports the conclusion that the burden is justified by the Government’s compelling interest in enforcing a public-welfare statutory scheme that, like the Social Security tax, simply “could not function” if for-profit employers of various “denominations were allowed to challenge the ... system because ... payments were spent in a manner that violates their religious belief.” O Centro, 546 U.S. at 435, 126 S.Ct. 1211 (quoting Lee, 455 U.S. at 258, 102 S.Ct. 1051).
The judgment of the District Court should be affirmed.